COMMUNITY HEALTH CENTER,
INCORPORATED, Plaintiff,

v.

Patricia WILSON–COKER, Defendant.

No. 3:01CV146 (JBA).

United States District Court,
D. Connecticut.

Nov. 30, 2001.

Richard R. Brown, Brown, Paindiris & Scott, Hartford, CT, Steven William Varney, Brown, Paindiris & Scott, Glastonbury, CT, James L. Feldesman, Jennifer B. Pennington, Feldesman, Tucker, Leifer, Fidell & Bank LLP, Washington, DC, for Plaintiff.

Phyllis E. Hyman, Richard J. Lynch, Attorney General's Office, Hartford, CT, for Defendant.

### Memorandum of Decision
### [Doc. # 22, 35 & 38]

ARTERTON, District Judge.

Community Health Center, Incorporated ("CHCI") filed this suit on January 26, 2001, challenging a variety of payment practices related to the reimbursement it receives from the State of Connecticut under the Medicaid program.

After several procedural turns, the sole defendant in the case is Patricia Wilson–Coker, the Commissioner of Connecticut's Department of Social Services ("DSS"), and the relief sought is an injunction barring further use of a 4,200 visit provider productivity screen that reduces the amount DSS reimburses CHCI for the care CHCI provides to Medicaid recipients. Both parties have moved for summary judgment on the sole remaining issue in the case, which is the legality of the specific productivity screen employed by DSS to reduce CHCI's Medicaid reimbursement.

Resolution of this dispute requires a detailed examination of an arcane and complex area of law. This case presents thorny issues of statutory interpretation and administrative law, including what deference this Court must give to the policies and procedures of the Centers for Medicare and Medicaid Services ("CMS"),[1] an agency created by Congress and charged with administering the Medicaid program.[2]

For the reasons set out below, the Court will grant summary judgment in CHCI's favor and enjoin Wilson–Coker from using the 4,200 visit screen to reduce future payments to CHCI.

### I. Factual Background

#### A. The Parties and Programs

CHCI is a non-profit, tax-exempt primary health care clinic that receives grant funds under Section 330 of the Public Health Service Act, 42 U.S.C. § 254b, which provides for primary and preventive health care services in medically-underserved areas throughout the United States. As a recipient of grant funds under 42 U.S.C. § 254b, CHCI is a Federally–Qualified Health Center, or

---

1. CMS is the new moniker for the former Health Care Financing Administration ("HCFA"). Tommy Thompson, the Secretary for Health and Human Services, had considered calling the agency the "Medicare and Medicaid Administration," but rejected the name because its abbreviation would be "MAMA," and Thompson reported that "women found that acronym insulting," and "it reinforced an image of the agency as paternalistic, or in this case, maternalistic, at a time when President Bush wants Medicare beneficiaries to take more responsibility for their health insurance options." Robert Pear, *Medicare Agency Changes Name In an Effort to Emphasize Service*, N.Y. Times, June 15, 2001, at A26.

2. In light of this fact, the Court invited CMS to intervene in this litigation by notice served on the United States Attorney's Office. *See* Notice to Thomas A. Scully, Administrator of the Centers for Medicare and Medicaid Services [Doc. # 57] (October 4, 2001). No response was received.

FQHC, under both the Medicare and Medicaid programs. 42 U.S.C. §§ 1395x(aa)(4) (Medicare) and 1396d(*l*)(2)(B) (Medicaid).

Medicaid was established in 1965 as Title XIX of the Social Security Act ("Grants to States for Medical Assistance Programs"), codified at 42 U.S.C. §§ 1396 *et. seq.*, to assist states in the provision of adequate medical care to eligible needy persons. A state elects to participate in the program, i.e., receive financial assistance from the federal government, by filing a state plan. Within broad national guidelines contained in federal law, each state (through its state plan) establishes its own eligibility standards; determines the type, amount, duration, and scope of services; sets the rate of payment for services; and administers its own program. *See* 42 U.S.C. § 1396a. Covered services to eligible beneficiaries are paid for by the state; federal financial participation is provided by grants from the federal government to the states. 42 U.S.C. § 1396b.

### B. FQHCs in the Medicaid Program

In recognition of the special niche filled by FQHCs in the provision of health care,[3]

federal law requires that state Medicaid plans cover services rendered at FQHCs. 42 U.S.C. §§ 1396a(a)(10)(A) & 1396d(a)(2)(C). This is a special provision in favor of FQHCs, because states generally have significant latitude in determining which providers and services will be included in the state plan and thus covered by Medicaid.

Until recently, the Medicaid statute also required cost-based reimbursement for FQHC services. 42 U.S.C. § 1396a(aa).[4] This was another special provision favoring FQHCs in that it existed despite the latitude states are normally given to set the rate of payment for covered services, and despite the fact that cost-based reimbursement has generally fallen out of favor because of its inflationary tendencies.[5]

Given that FQHCs are not-for-profit entities that cannot pass budgetary shortfalls onto owners or other payers, Congress was particularly concerned that states might indirectly use Public Health Service grants under 42 U.S.C. § 254b (which are paid entirely by the federal government) to subsidize state Medicaid costs (which are paid in part by the states):

3. In order to qualify for FQHC status, a health care facility must be located in a medically underserved area or serve a medically underserved population, and it must be community based in that the majority of the members of its board of directors must be patients of the center who, as a group, represent the individuals being served by the center. FQHCs are required to provide an uncommonly broad array of services, and must serve all members of the community without regard for their ability to pay. *See generally* 42 U.S.C. § 254b.

4. Late last year, Congress passed a bill that over time replaced cost-based reimbursement with a prospective payment system ("PPS"). The law is referred to as the Benefits Improvement and Protection Act of 2000 ("BIPA"), Pub.L. No. 106–554 (Dec. 21,

2000), and the sections relevant to FQHC reimbursement are codified at 42 U.S.C. § 1396a(aa). In the shift from cost-based reimbursement to the PPS, Congress required that the new per-visit rate be calculated on the basis of what the FQHC received previously under the old cost-based system. Thus, the cost-based reimbursement from the prior years is essentially frozen into place and will affect the new PPS rate indefinitely, or at least until Congress amends the statute.

5. *See, e.g.,* Rand Rosenblatt *et al., Law and the American Health Care System* 470 (1997) (cost-based reimbursement "created extraordinary inflationary pressures: the higher the [provider's] costs, the higher its reimbursement. The system was also inequitable, since it rewarded costs, not quality or efficiency. [I]t paid to be costly and sloppy.").

To ensure that Federal PHS Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries, States would be required to make payment for these services at 100 percent of the costs which are reasonable and related to the cost of furnishing these services.

H.R.Rep. No. 101–247 at 393, *reprinted in* 1989 U.S.C.C.A.N. 2119.

The cost-based reimbursement mechanism for FQHCs in the Medicaid program is contained in 42 U.S.C. § 1396a(aa)(2), which provides:

[T]he State plan shall provide for payment for such services in an amount (calculated on a per visit basis) that is equal to 100 percent of the average of the costs of the center or clinic of furnishing such services during fiscal years 1999 and 2000 which are reasonable and related to the cost of furnishing such services, or based on such other tests of reasonableness as the Secretary prescribes in regulations under [Medicare], or, in the case of services to which such regulations do not apply, the same methodology used under [Medicare], adjusted to take into account any increase or decrease in the scope of such services furnished by the center or clinic during fiscal year 2001.

## C. Productivity Screens

Connecticut's state plan requires payments to providers to be lowered if the providers fail to meet a 4,200 visit productivity screen, which has been in place since 1996.[6] This screen reduces the payments that DSS makes to CHCI (and any other FQHC Medicaid provider) if the clinic's physicians have fewer than 4,200 patient visits per year. The screen sets 4,200 visits as the baseline assumption; if a physician has fewer visits, DSS reduces the clinics reimbursement on a pro rata basis. For example, if a CHCI physician had only 3,800 patient visits in one year, DSS would only reimburse CHCI 90.4% of CHCI's actual cost of providing those visits. The state contends that the screen promotes efficiency by mandating a certain level of volume, while CHCI claims the screen is too blunt a tool for that task in that it fails to take account of more subtle factors bearing on the reasonableness of a physician's productivity, such as the nature of the physician's practice and his or her patients' needs.

Without the screen in place, CHCI would receive approximately $90,000 more per year in Medicaid reimbursement. CHCI asserts that this dramatic shortfall cannot be recouped from other payers and thus threatens its ability to serve its needy patients.

## II. Analysis

■ The issue in this case is whether the productivity screen present in the state plan is valid in light of the statutory cost-based reimbursement provision, which represents Congress's mandate that FQHCs be reimbursed on a cost basis.

■ All provisions of a state plan must comply with federal statutes, regulations

---

**6.** Connecticut's 2001 amendment to its Medicaid state plan formally amended the plan to raise the screen from 3,500 visits to 4,200 visits. The 3,500 visit screen had been in the regulations since 1989, but DSS has applied the more stringent 4,200 visit screen since 1996, when the legislature passed a law mandating Medicare productivity standards for FQHC reimbursement. DSS never changed the state plan or the underlying administrative regulations to reflect the 4,200 visit screen, and relied instead on the principle that a state statute trumps state administrative regulations.

CMS approved the amended state plan in July 2001.

and official issuances of CMS. 42 C.F.R. § 430.10. " 'In passing on the validity of a state Medicaid plan under federal law, the court must determine whether the plan is procedurally and substantively in compliance with the requirements of the Federal Medicaid Act and its implementing regulations.' " *DeLuca v. Hammons,* 927 F.Supp. 132, 133 (S.D.N.Y.1996), *quoting Amisub (PSL), Inc. v. Colorado Dep't of Social Servs.,* 879 F.2d 789, 795 (10th Cir.1989).

### A. The Statutory Underpinnings of Reasonable Cost Reimbursement

It is clear from the text of the statutory reimbursement mechanism, 42 U.S.C. § 1396a(aa)(2), that only "reasonable" costs will be reimbursed—not all costs. Two key disputes between the parties are *who* gets to determine which costs are reasonable and *how* they must do so.

The statutory reimbursement mechanism is exactly the same as it was when originally enacted in 1989—except for a change in punctuation in the last enactment, on December 21, 2000.[7] The old statute read:

[T]he State plan shall provide for payment for such services in an amount (calculated on a per visit basis) that is equal to 100 percent of the average of the costs of the center or clinic of furnishing such services during fiscal years 1999 and 2000 which are reasonable and related to the cost of furnishing such services or based on such other tests of reasonableness, as the Secretary prescribes in regulations under [42 U.S.C. § 13951(a)(3) ], or, in the case of services to which such regulations do not apply, the same methodology used under [42 U.S.C. § 13951(a)(3) ], adjusted to take into account any increase or decrease in the scope of such services fur-

nished by the center or clinic during fiscal year 2001.

What has changed is the placement of one comma, which has moved eight words to the left. The *former* statute reads:

[The state shall pay FQHCs] 100 percent of the average of the costs ... which are reasonable and related to the cost of furnishing such services or based on such other tests of reasonableness, as the Secretary prescribes in regulations under [Medicare].

Under the old version, it was clear that any definition of or limitation on the reasonableness of costs had to be found in the Medicare statute or regulations.

The *current* statute reads:

[The state shall pay FQHCs] 100 percent of the average of the costs ... which are reasonable and related to the cost of furnishing such services, or based on such other tests of reasonableness as the Secretary prescribes in regulations under [Medicare].

By shifting the comma eight words to the left, an argument could be made that the statute's meaning has changed. The new statute, with its disjunctive comma after "services," could indicate that tests of reasonableness prescribed in regulations under Medicare *are only one possible source* of proxies and screens, with the language before the new comma providing an independent source of authority to either CMS (unhinged from the requirement that such tests of reasonableness be promulgated in regulations under Medicare) or the states.

CHCI argues that since there is no legislative history whatsoever indicating Congress's intent to change the meaning, and since the statute has remained the same since its enactment in 1989, only to be

---

**7.** The new section is found in § 702 of BIPA, codified at 42 U.S.C. § 1396a(aa)(2).

changed last year (two weeks before it was to take effect), the punctuation changes must be a scrivener's error.

Wilson–Coker acquiesces in the view that no explanation exists for the changed comma placement, and notes that CMS treats the statute as meaning the same thing as it did prior to the comma shift. However, she maintains that the statute has all along provided for tests of reasonableness outside the Medicare regulations promulgated by CMS, both under the old and new language of the statute.

CMS treats the present statute as meaning the same thing as its earlier version. In a CMS-issued "Q & A" on BIPA's new prospective payment system for Medicaid FQHCs, CMS addressed the BIPA legislation:

> Question: The legislation states that the per visit rate shall be an amount that is equal to 100 percent of the average costs of the center/clinic during fiscal year 1999 and fiscal year 2000 which are reasonable. What are the tests of reasonableness?
>
> Answer: The BIPA legislation requires states to use tests of reasonableness in effect in fiscal year 1999 and fiscal year 2000 in establishing a PPS rate or, as prescribed in regulations under. section

1833(a)(3) of the Social Security Act. This section of the statute allows for the application of caps and productivity screens.

(all punctuation as in original).[8]

The fact that CMS, the agency entrusted by Congress with the administration of the Medicare and Medicaid programs, reads the new statute the same way it read the old statute is evidence that the change in punctuation did not substantively change the statute's meaning. Rather than being an estoppel argument, which is disfavored in statutory construction,[9] CMS's long-standing view of the law is one interpretive tool available to the Court as it determines what Congress legislated in 42 U.S.C. § 1396a(aa)(2). "It is by now a commonplace that when faced with a problem of statutory construction, [courts show] great deference to the interpretation given the statute by the officers or agency charged with its administration." *EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980) (citations and quotations omitted); *accord United States v. Mead Corp.*, 533 U.S. 218, ——, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (" 'considerable weight should be accorded to an executive department's construction of a statutory scheme it is en-

---

**8.** In a felicitous twist of irony, CMS itself placed an awkward comma in a grammatically inappropriate place in the above "Q & A" and thus created ambiguity: Is the comma after "or" on the third line of the answer supposed to be *before* the word "or," which would comport with the new statute in that it would allow for tests of reasonableness that existed outside the Medicare regulations, or should it be somewhere else? It certainly does not belong between "or" and "as," where CMS placed it.

**9.** The parties' essential agreement on the scrivener's error theory is insufficient for the Court to conclusively proceed on that assumption. *See South Ottawa v. Perkins*, 94 U.S. 260, 267, 4 Otto 260, 24 L.Ed. 154

(1876) ("There can be no estoppel in the way of ascertaining the existence of a law. That which purports to be a law of a State is a law, or it is not a law, according as the truth of the fact may be, and not according to the shifting circumstances of parties. It would be an intolerable state of things if a document purporting to be an act of the legislature could thus be a law in one case and for one party, and not a law in another case and for another party; a law to-day, and not a law to-morrow; a law in one place, and not a law in another in the same State. And whether it be a law, or not a law, is a judicial question, to be settled and determined by the courts and judges.").

trusted to administer' "), *quoting Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Bragdon v. Abbott,* 524 U.S. 624, 642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) ("The well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' "), *quoting Skidmore v. Swift & Co.,* 323 U.S. 134 139–140, 65 S.Ct. 161, 89 L.Ed. 124.

It is clear from the reference to "costs which are reasonable" that what the reimbursement mechanism of the statute is meant to reflect is a cost-based reimbursement system. Because Medicaid does not generally use cost-based reimbursement, the statute references provisions of the *Medicare* statute, which does specifically provide for cost-based reimbursement. The referenced Medicare provision, 42 U.S.C. § 13951(a)(3), uses identical "reasonableness" language—yet it omits the comma altogether. It provides that Medicare will pay FQHCs:

> the costs which are reasonable and related to the cost of furnishing such services or which are based on such other tests of reasonableness as the Secretary may prescribe in regulations, including those authorized under [42 U.S.C § 1395x(v)(1)(A) ].

42 U.S.C. § 13951(a)(3).

In the context of the statute as a whole, it is thus clear that 42 U.S.C. § 1396a(aa)(2) imports the "costs which are reasonable and related to the cost of furnishing such services or which are based on such other tests of reasonableness as the Secretary may prescribe in regulations" language—which authorizes cost-based reimbursement and is expressly

contained in the Medicare statute and in every incarnation of the Medicaid FQHC reimbursement mechanism until the last— and then references start here the Medicare statute and regulations, which explicitly instruct how such costs are to be determined. Medicaid lacks the cost-based architecture that exists in the Medicare statute and is still the reimbursement mechanism for at least some Medicare services, so to speak of "reasonable costs" in the Medicaid program while referencing a corresponding Medicare statute that provides extensive guidance (both in the statute and in regulations) regarding how "reasonable costs" are to be determined can only be read as importing the Medicare standards.

This reading also makes sense in light of the fact that the regulations on cost-based reimbursement distinguish between costs that are related to the cost of furnishing services and those that are otherwise reasonable even though they are not related to the cost of furnishing services. Not all reasonable costs that will be allowed are actually related to the cost of furnishing services. This is conceived as one of the blessings of a cost-based reimbursement system: Congress has made a policy choice that certain costs, such as the expense of training new doctors,[10] office overhead and depreciation,[11] and certain bad debts [12] should be included in the reimbursement methodology. Thus, those costs—while not necessarily "related to the cost of furnishing such services"—are nonetheless included in the reimbursement matrix, because they are specifically provided for in regulations under Medicare.

Medicare's specific statutory definition of "reasonable costs" is located at 42 U.S.C. 1395x(v):

---

**10.** 42 C.F.R. § 405.2468(f).

**11.** 42 C.F.R. § 405.2468(b)(3).

**12.** 42 C.F.R. § 413.5(c)(6).

The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services. . . .

42 U.S.C. § 1395x(v)(1)(A).

Medicaid has no such specific statutory definition, and has little in the way of guidance on reasonable costs at all. To read the Medicaid statute as allowing for reasonable costs to be determined outside of the Medicare statutory and regulatory framework divorces "reasonable costs"—which is something of a Medicare cost-based reimbursement term of art—from the Medicare statutory and regulatory "anchor" that has always given that phrase meaning. Without that statutory and regulatory framework, "reasonable costs" becomes an empty phrase. If "reasonable costs" is whatever the state says that it is (i.e., if the state can apply its own proxies, screens and caps without regard to the statute and regulations), FQHCs are no longer in a different position from any other provider, despite the fact that Congress specifically provided for cost-based reimbursement for FQHCs for the express purpose of ensuring that state Medicaid programs do not subtly shift FQHCs' expenses in treating Medicaid patients onto the federal government's public health service grant system, which is financed en-

tirely by the federal government. Given its context and history, it is clear that the statutory reimbursement mechanism codified at 42 U.S.C. § 1396a(aa)(2) requires reasonable cost to be determined under the Medicare statute and regulations.[13]

DSS's authority to reduce payments to CHCI based on a screen is thus derived from the statutory language that reads, "costs which are reasonable and related to the cost of furnishing such services or which are based on such other tests of reasonableness as the Secretary may prescribe in regulations," which is codified at 42 U.S.C. § 13951(a)(3). This statute, in turn, references Medicare's definition of "reasonable costs," found at 42 U.S.C. § 1395x(v). CMS has promulgated regulations under both sections indicating how "reasonable costs" are actually determined. 42 C.F.R. Parts 405 & 413. Any tests of reasonableness, such as the 4,200 visit screen, must be provided for in these statutory and regulatory provisions.

### B. Medicare Regulations & the 4,200 Visit Screen

There are two regulatory sources of authority for the 4,200 visit screen: (1) regulations promulgated first in the Federal Register and later codified in the Code of Federal Regulations; and (2) regulations promulgated solely in the Federal Register and never promulgated in the Code of Federal Regulations. The first set, which the Court will refer to as "C.F.R. Regulations," contain general provisions for productivity screens but do not contain the actual 4,200 visit screen itself. The second

---

**13.** This is in the absence of a Medicaid statutory or regulatory definition of "reasonable cost." To date CMS has never promulgated Medicaid FQHC reimbursement regulations, and the statute and the agency's practice both indicate that the Medicare regulations should apply until such regulations are promulgated. In the 1992 Medicare FQHC regulations,

CMS indicated that "[r]elated Medicaid rules are being developed in a separate rulemaking document." 47 F.R. 24961, 24961 (June 12, 1992). By 1996, CMS acknowledged that the Medicaid FQHC rules were still not complete. 61 F.R. 14640, 14641 (April 3, 1996). As of today, no Medicaid FQHC reimbursement regulations have been promulgated.

set, which the Court will refer to as "F.R. Regulations," contain the specific 4,200 visit screen. The specific 4,200 visit screen is also contained in the Medicare Manual,[14] which is CMS's construction of its regulations. *See Keefe v. Shalala*, 71 F.3d 1060, 1065 (2d Cir.1995), *citing Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986) and *St. Mary's Hospital v. Blue Cross & Blue Shield Ass'n*, 788 F.2d 888, 890 (2d Cir.1986).

### 1. Overview

As explained in detail below, the specific 4,200 visit productivity screen at issue here must itself be contained in the regulations. Thus, the Court must first examine each of the two sources of regulatory authority regarding the screen (i.e., the C.F.R. Regulations and the F.R. Regulations), with two specific questions. First, the Court must determine whether the regulation in question actually imposes the 4,200 visit screen. If that regulation provides for the screen with sufficient specificity, the Court must then determine whether that regulation was validly promulgated.

The Court concludes that as to the first regulatory provision, the C.F.R. Regulations, the answer to the first question is in the negative: the C.F.R. Regulations do not actually impose the screen by their terms, as is required by the statute. As to the second regulatory provision, the F.R. Regulations, the Court concludes that while the answer to the first question is in the affirmative (i.e., the F.R. Regulations do impose the specific 4,200 visit screen), the answer to the second question is in the negative—the F.R. Regulations were not validly promulgated. Thus, there are no validly promulgated regulations that specifically impose the 4,200 visit screen, and the screen is illegal.

### 2. The Regulations Must Contain the 4,200 Visit Screen

In order for the state to reduce its Medicaid payments through use of the specific 4,200 visit screen, the 4,200 visit number *itself* must be present in the regulations, because 42 U.S.C. § 1396a(aa)(2) references "regulations," not the Medicare Manual or other interpretive guidance provided by CMS. In addition to the plain language ("regulations") of 42 U.S.C. § 1396a(aa)(2), 42 U.S.C. § 1395hh(a) provides:

(1) The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this title [Medicare]. When used in this title, the term "regulations" means, unless the context otherwise requires, regulations prescribed by the Secretary.

(2) No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this title [Medicare] shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

Whether an agency promulgation is in fact a "rule" (also known as a regulation [15])

---

**14.** In the Medicare Manual applicable to RHCs and FQHCs, attached as Ex. (B)(5) to Def.'s Mem.Opp'n Application Prelim.Inj. [Doc. # 27], CMS indicates that the productivity screens are applicable to both RHCs and FQHCs. Specifically, §§ 502 & 503 set out the 4,200 visit guideline and indicates that it applies to both RHCs and FQHCs.

**15.** The term "regulation" is synonymous with "rule," because the APA classifies all administrative action as either "rules" or "orders,"

is not as straightforward as it might appear at first blush. The APA defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy" or to establish rules of practice. 5 U.S.C. § 551(4).

In *Carter v. Cleland,* 643 F.2d 1 (D.C.Cir.1980), the D.C. Circuit was faced with a Veteran's Administration policy termed the "birth by another rule," and was required to determine whether the rule was, in fact, a regulation:

> On its face, the "birth by another rule" appears to be an administrative guideline rather than a regulation: it has never been subjected to the notice and comment requirement and it is not contained in the Code of Federal Regulations. In general, however, a rule's form is not determinative of whether or not it should be classified as a regulation. [W]e must look to the guideline's substance and practical effect.... The 'birth by another rule' simply embodies the Administrator's interpretation of Congress' continuous cohabitation requirement....

*Id.* at 8, *citing Guardian Federal Sav. & Loan Asso. v. Federal Sav. & Loan Ins. Corp.,* 589 F.2d 658, 666 (D.C.Cir.1978).

The distinction seems to conflate the definition of "rule" with the distinction between "interpretive" and "legislative" rules. The Second Circuit examined this distinction in *Clarry v. United States,* 85 F.3d 1041 (2d Cir.1996), where the court addressed a claim that the Office of Personnel Management (OPM) failed to comply with the APA's notice and comment rulemaking procedures before adopting a policy of barring air traffic control strikers

for an indefinite period from re-employment with the Federal Aviation Administration.

> Under the APA, there are two distinct types of rules—legislative rules and interpretive rules. Legislative rules are those that 'create new law, rights, or duties in what amounts to a legislative act.' Interpretative rules, however, do not create rights, but instead 'clarify an existing statute or regulation.' Because they do not create or destroy any rights, interpretive rules are exempt from the APA's notice and comment procedures.

*Id.* at 1048, *quoting White v. Shalala,* 7 F.3d 296, 303 (2d Cir.1993) and *citing* 5 U.S.C. § 553(b)(3)(A) and *New York City Employees' Retirement Sys. v. SEC,* 45 F.3d 7, 12 (2d Cir.1995).

In *Clarry,* OPM's regulations in place at the time of the strike enumerated several factors used to determine whether a person is suitable for employment in the federal government, including whether their conduct " 'may reasonably be expected to interfere with or prevent the effective performance' " by the individual of his or her duties in the position or the agency in its fulfillment of its duties. *Id., quoting* 5 C.F.R. § 731.202. After the strike, OPM banned re-employment of the strikers with FAA indefinitely. The strikers challenged the ban under the APA. The Second Circuit held that OPM's ban on re-employment was interpretive and not legislative, because the ban "was based on an interpretation of [OPM's] own regulations [and it] neither created any new law or rights nor was derived from an interpretation of OPM's own regulations." *Clarry,* 85 F.3d at 1049.

and rules are actions of general applicability that are quasi-legislative, while orders are ad-

judicatory in nature.

CMS's use of the 4,200 visit screen is more than an interpretation of the provisions in the regulations that allow for screens. The striking air traffic controllers in *Clarry* would not have been allowed to return to employment at the FAA even in the absence of the explicit re-employment ban, because in OPM's view, their prior conduct may reasonably have been expected to interfere with their jobs or FAA's mission, and thus they were unsuitable under the already-existing regulation. The 4,200 visit provider screen, however, will cut out costs that would be reimbursable under, for example, a 3,500 visit screen, and will include costs that would be excluded under a 5,000 visit screen. In other words, specifying "4,200 visits" is more than an "interpretation" of what the word "screens" means in the regulations. In contrast, saying "no employment for strikers" is only an interpretation of "no employment for unsuitable people," because OPM is specifying who, in its view, is unsuitable.

CMS's specific provision of 4,200 visits as the required screen is a legislative regulation, because it creates new rights and has a general prospective affect. Thus, the authority that specifies the standard as 4,200 visits must itself be a validly-promulgated regulation.

### 3. The C.F.R. Regulations

CMS has promulgated regulations under both relevant Medicare statutes, 42 U.S.C. §§ 13951(a) (Medicare's cost-based reimbursement scheme) and 1395x(V)(1)(A) (Medicare's definition of reasonable costs), further clarifying when tests may be used to determine whether costs are reasonable.

These regulations were first published in the Federal Register and are now codified in the Code of Federal Regulations.

Medicare reimbursement to Rural Health Clinics ("RHCs")[16] and FQHCs is governed specifically by 42 C.F.R. Part 405, and generally by 42 C.F.R. Part 413. The regulations in Part 405 were initially adopted in 1978 as to RHCs, and FQHCs were included in 1992.

When CMS added FQHCs into the regulations in 1992, it specifically indicated that it intended to apply the same reimbursement methodology to FQHCs as it already applied to RHCs, including the 4,200 visit screen:

> We considered using several methodologies for payment to FQHCs, but because the benefit is so similar to the RHC benefit, we believe that for simplicity and administrative ease, it is more feasible to adopt the RHC methodology for FQHCs.

57 F.R. 24961, 24967 (June 12, 1992).

These reimbursement regulations indicate that both RHCs and FQHCs will be paid "on the basis of an all-inclusive rate," 42 C.F.R. § 405.2462(b), and the all-inclusive rate "is subject to any tests of reasonableness that may be established in accordance with this subpart," 42 C.F.R. § 405.2464(a)(3). When CMS added FQHCs to the RHC regulations in 1992, it specifically discussed these "tests of reasonableness," and set out the 4,200 visit guideline. 47 F.R. 24961, 24967 (June 12, 1992).

The only other point in Part 405 that specifically mentions tests of reasonable-

---

**16.** Public L. No. 95–210 (December 13, 1977) established the RHC program to facilitate access to health care by rural residents. Like the FQHC program, Congress mandated that RHCs be reimbursed on a cost basis in both the Medicare and the Medicaid programs.

Section § 702 of BIPA, 42 U.S.C. § 1396(a)(aa), which allows states to switch to a prospective payment system with regard to Medicaid FQHC costs, applies to Medicaid RHC costs, as well.

ness, however, is § 405.2468, which provides specifically for tests of reasonableness for RHCs, without reference to FQHCs:

(c) Tests of reasonableness for rural health clinic cost and utilization. Tests of reasonableness authorized by [42 U.S.C. §§ 1395l(a) and 1395x(v)(1)(A) ] may be established by HCFA or the carrier with respect to direct or indirect overall costs, costs of specific items and services, or costs of groups of items and services. Those tests include, but are not limited to, screening guidelines and payment limitations.

(d) Screening guidelines. (1) Costs in excess of amounts established by the guidelines are not included unless the clinic or center provides reasonable justification satisfactory to the intermediary.

(2) Screening guidelines are used to assess the costs of services, including the following:

(i) Compensation for the professional and supervisory services of physicians and for the services of physician assistants, nurse practitioners, and nurse-midwives.

(ii) Services of physicians, physician assistants, nurse practitioners, nurse-midwives, visiting nurses, qualified clinical psychologists, and clinical social workers.

(iii) The level of administrative and general expenses.

(iv) Staffing (for example, the ratio of other clinic or center personnel to physicians, physician assistants, and nurse practitioners).

(v) The reasonableness of payments for services purchased by the clinic or center, subject to the limitation that the costs of physician services purchased by the clinic or center may not exceed amounts determined under the applicable provisions of subpart E of part 405 or part 415 of this chapter.

42 C.F.R. 405.2468 subsections (c) and (d).[17]

In sum, it is clear that the C.F.R. Regulations countenance the use of productivity screens, without specifically setting the parameters of such a screen (i.e., the regulations in the C.F.R. do not specifically use the figure 4,200). Thus, they cannot serve as a legal basis for the imposition of this specific 4,200 visit screen.

### 4. The F.R. Regulations

#### a. Specificity and Facial Regularity

While the 4,200 visit number has never been codified in the C.F.R., it has appeared in the Federal Register multiple times over the past two decades.

CMS has applied some form of productivity screen to Rural Health Clinics since 1978, when it published a "Notice" entitled "Screening Guidelines and Payment Limit for Medicare and Medicaid Reimbursement" in the Federal Register. 43 F.R. 42787 (September 21, 1978). The notice set out the statutory basis and rationale for the guidelines, and required at least three visits per hour per physician. The notice specifically referenced use of similar guidelines by the Bureau of Community Health Services (BCHS), an HHS agency that awards grants to RHCs.[18]

**17.** In light of the 1992 promulgation in which CMS specifically indicated that it was adopting the same reimbursement methodology, the title of subsection (c), which references only RHCs, may be an error. Even if it is not, the other provisions of 42 C.F.R. Part 405 indicate the possibility of screens.

**18.** BCHS is now known as the Health Resources and Services Administration ("HRSA").

In 1980, CMS published a proposed rule in the federal register:

In addition to [the] proposed changes in our payment method, we are proposing to revise the current screening guidelines for clinic productivity and overhead costs (set forth in a notice published on September 21, 1978 (43 F.R. 42787)) to conform to the guidelines used by the Bureau of Community Health Services (BCHS), Public Health Service.

. . . . .

The House and Senate committee reports accompanying the RHC benefit legislation (Pub.L.95–210) direct the Secretary to establish screening guidelines to identify situations in which costs would not be allowed without further investigation or reasonable justification. At present, we use two such guidelines. The guidelines appeared in the September 21, 1978, Federal Register (42 FR 42787). . . . We propose to use productivity guidelines that are the same as BCHS to evaluate the performance of Federally funded health center grants. [The BCHS guidelines provide for the 4,200 visit screen.]

45 F.R. 59734 (September 10, 1980).

After receiving comments on the 1980 proposed rule, CMS issued a Final Notice at 47 FR 54163 (December 1, 1982): "This notice establishes revised productivity screening guidelines and a revised upper limit on Medicare and Medicaid rates of payment for rural health clinic services furnished by independent rural health clinics." After setting out the history of the 4,200 visit screen, CMS announced:

We have selected these guidelines for several reasons. First, approximately two-thirds of all facilities now participating in Medicare and Medicaid as RHCs also receive grants from BCHS. BCHS has had extensive experience with such clinics, predating [CMS] involvement be-ginning in 1978. They use these productivity guidelines in their grant review process, and have revised them to improve their appropriateness. Because many clinics already are subject to BCHS productivity guidelines, adoption of these guidelines by [CMS] will not impose any additional burden on the clinics. [CMS's] adoption of these guidelines ensures that these clinics are not subject to different guidelines imposed by two different agencies of HHS.

Our estimates of the actual productivity of clinics now reporting their costs and utilization to [CMS] show that physicians, physician assistants, and nurse practitioners have average FTE productivity substantially greater than the minimum guidelines. We expect, therefore, that clinics not receiving BCHS grants will also have little or no difficulty in meeting the guidelines, unless there are special circumstances preventing this (in which case the clinic could apply for an exception).

In 1992, CMS added FQHCs to the RHC regulations in a "Final Rule with Comment Period," 47 F.R. 24961, 24967 (June 12, 1992). Again, CMS specifically set out the 4,200 visit guideline, and explained that it was applying the guideline to FQHCs "because the benefit is so similar to the RHC benefit, [so] we believe that for simplicity and administrative ease, it is more feasible to adopt the RHC methodology for FQHCs."

CMS revisited the rules in 1996, when it addressed comments received since the 1992 initial promulgation in a question and answer format and promulgated a final rule retaining the 4,200 visit screen. As required by the ADA, CMS responded to comments on the necessity and propriety of the 4,200 visit screen as applied to FQHCs. 61 F.R. 14640 (April 3, 1996).

Because the F.R. Regulations specifically set out the 4,200 visit screen, the Court must determine whether those regulations are validly promulgated. When CMS established the 4,200 visit screen in the F.R. Regulations, it was required to follow the "informal rulemaking," or notice and comment, procedures of 5 U.S.C. § 553, because in the absence of directives to the contrary in the agency's enabling legislation, the APA's informal rulemaking procedures apply whenever the agency issues substantive rules that are not otherwise exempted from the APA. *See* 5 U.S.C. § 553(c) (informal rulemaking does not apply when "rules are required by statute to be made on the record after opportunity for an agency hearing") and § 553(b) (exempting certain rules from the APA altogether, including, *inter alia*, interpretive rules and general statements of policy).

The APA's notice and comment rulemaking process consists of three steps. First, the agency must give notice in the Federal Register. 5 U.S.C. § 553(b). Second, the agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). Finally, the agency must consider the relevant matter presented and issue the final rules. *Id.*

On their face, the F.R. Regulations that contain the specific 4,200 visit screen comply with the APA's informal rulemaking procedures because CMS: (i) provided no-tice in the Federal Register explaining the terms and substance of the screen and referencing the legal authority under which the rules were proposed; (ii) solicited comments on the screen; and (iii) considered the comments received and promulgated a final rule. *See* 5 U.S.C. § 553.

### b. The "Bureaucratic Bungle"

CHCI argues that CMS's promulgation of and adherence to the 4,200 visit screen is nothing more than a "bureaucratic bungle" that is entitled to no deference from the Court, because HRSA (formerly BCHS) abandoned the 4,200 visit screen in 1993 as unnecessary. CHCI's argument is centered around the fact that HRSA's use of the screen was the primary motivating factor in CMS's use of the screen, and that CMS specifically stated in 1996 that its reason for retaining the screen was HRSA's use—even though HRSA had actually stopped using it in 1993.

Because CMS has complied with the informal rulemaking procedures, the Court's review of the 4,200 visit screen is appropriately circumscribed in scope. Reversal of CMS's selection of the 4,200 visit screen is appropriate only if the decision to include the screen "was not supported by substantial evidence or was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Fund for Animals v. Babbitt,* 89 F.3d 128, 132 (2d Cir.1996) (citations omitted); *accord* 5 U.S.C.A. § 706.[19]

---

**19.** The APA provides: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this

■ "Although the scope of judicial review under this standard is narrow and deferential, a reviewing court must be certain that an agency has considered all the important aspects of the issue and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Henley v. Food and Drug Admin.*, 77 F.3d 616, 620 (2d Cir.1996), *citing, inter alia, Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (internal quotations omitted).

■ It is by now axiomatic that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *accord Fort Stewart Schools v. Federal Labor Relations Auth.*, 495 U.S. 641, 651–652, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990) ("it is elementary that if an agency's decision is to be sustained in the courts on any rationale under which the agency's factual or legal determinations are entitled to deference, it must be upheld on the rationale set forth by the agency itself").

Here, the Court is presented with CMS's inclusion of a 4,200 visit screen in the Medicare reimbursement regulations. Throughout the long regulatory history of this screen, CMS has offered only one reason for its use of this particular figure: HRSA used it. With that as its primary reason, CMS obliquely refers to the screen's "reasonableness."

HRSA abandoned the screen in 1993. It is certainly conceivable, as DSS has argued, that CMS decided to retain the screen notwithstanding HRSA's abandonment of it because of HRSA'a successful experiences with it. However, CMS revisited the screen in 1996 as part of its response to comments about its propriety. The screen had already been abandoned by HRSA for three years, yet CMS's only stated reason for retaining the screen was the fact that HRSA still used it:

> Comment: A number of commenters stated that the screening guidelines are not appropriate for all FQHCs. For instance, a commenter stated that, without special attention, small rural health centers and those in frontier areas would be penalized by the productivity and overhead screens. Two other commenters stated that the standard should be lowered and that separate and lower standards should be developed to apply to FQHCs with home visiting and teaching programs. The commenter stated that Federal policy is clearly moving in the direction of providing incentives to increase the number of primary care physicians and that health centers will be increasingly asked to take on the role of residency training and argued that a productivity standard should not impede this policy direction. Additionally, two other commenters stated that the hourly standard, used in the past by the FFHCs, of 2.4 visits per hour is a more realistic standard than the one we had published.
>
> Response: We use the same guidelines applied by HRSA [formerly BCHS] in the grant review process and the ongoing monitoring of its programs. We believe it is appropriate to use uniform productivity guidelines rather than de-

title or otherwise reviewed on the record of an agency hearing provided by statute; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706.

veloping separate guidelines. If, however, an FQHC cannot meet these guidelines, the FQHC's intermediary has the authority to modify the productivity guidelines. An FQHC that has atypical circumstances may request exceptions to the guidelines from its intermediary.

61 F.R. 14640, 14650–51 (April 3, 1996).

While CMS now claims that it knew in 1996 that HRSA had abandoned the screen and the response was erroneously included,[20] this type of post hoc rationalization is simply not permitted in administrative law. As explained by the Supreme Court in, *inter alia, Chenery, Fort Stewart Schools,* and *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 49–50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), courts uphold agency actions, if at all, on the basis articulated by the agencies themselves. CMS articulated a basis in 1996, and the Court must look to what CMS said at that time.

CMS's stated reason in the 1996 promulgation was that CMS was retaining the screen because HRSA was still using it. In fact, HRSA had in fact abandoned it years earlier.[21] CMS's stated explanation—the explanation upon which the Court must rely—is thus wholly irrational, and thus arbitrary and capricious. *See id.* at 43, 103 S.Ct. 2856 ("Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important area or the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.")

DSS argues vigorously that the Court must defer to CMS's expertise in this complex area. CMS has unambiguously expressed its interpretation that the 4,200 visit screen is proper. First, it included the screen in the Medicare Manual. Second, it approved Connecticut's state plan, which has the screen.

DSS correctly points out that the Medicare Manual is entitled to deference under Second Circuit case law. In addressing another provision in the Medicare Manual, the Second Circuit observed:

These provisions are valid interpretive rules and are promulgated by the Secretary under the authority of [the Medicare statute]. They are neither irrational nor contradicted by other regulations.

*Keefe v. Shalala,* 71 F.3d 1060, 1065 (2d Cir.1995), *citing Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986) for the proposition that "an 'agency's construction of its own regulations is entitled to substantial deference' " and *St. Mary's Hospital v. Blue Cross & Blue Shield Ass'n,* 788 F.2d 888, 890 (2d Cir. 1986) for the proposition that "Medicare Provider Reimbursement Manual is an 'interpretive' document entitled to persuasive weight.' "

---

**20.** DSS submitted an affidavit from a David Worgo, a CMS employee for thirteen years who claims to have been "responsible for coverage and payment issues pertaining to [FQHC] programs under Medicare and Medicaid" for ten years. Wargo Aff. ¶ 4 [Doc. # 41]. In his affidavit, Worgo states "CMS was aware in July of 1993 that HRSA was eliminating the use of productivity screens beginning in Fiscal Year 1994 for its grant-funded health centers." *Id.* at ¶ 17.

**21.** Even if Worgo's assertion in his affidavit that CMS knew in 1993 that HRSA was abandoning the 4,200 visit screen is true, that fact seems to undercut DSS's case, in that it makes the 1996 regulations all the more arbitrary: if CMS knew that HRSA abandoned the screens in 1993, its explanation three years later that it was retaining the screens because HRSA still used them is more problematic than just a "bureaucratic bungle."

While the Medicare Manual may be a valid interpretive tool, it has little value in this case, in that it "interprets" a legislative regulation that is arbitrary as based on an admittedly false or erroneous rationale.

Similarly, CMS's approval of Connecticut's Medicaid plan, while likely entitled to deference as a general rule, is not in this case, because CMS's approval was based on the same irrational regulation.

III. Conclusion

By the terms of 42 U.S.C. § 1396a(aa)(2), DSS is required to pay CHCI on a cost basis. While productivity screens as a general proposition are contemplated in the applicable regulations, the specific 4,200 visit standard contained in Connecticut's state plan is not found in *validly-promulgated* regulations. DSS's use of the 4,200 visit screen to reduce payments to CHCI is thus unlawful, and it will be enjoined.

For the reasons set out above, CHCI's motions for summary judgment [Doc. # 35] and for final injunctive relief [Doc. # 22] are GRANTED, and Wilson–Coker's motion for summary judgment [Doc. # 38] is DENIED.

Patricia Wilson–Coker, the Commissioner of the State of Connecticut's Department of Social Services, is hereby EN-JOINED from applying, either directly or indirectly, the imputed primary care visit requirement of 4,200 visits per year when computing and paying any future sums to which Community Health Center, Incorporated, is due under the Medicaid program, 42 U.S.C. §§ 1396 *et seq.* Wilson–Coker shall not reduce any future payments to Community Health Center, Incorporated, whether those payments are made under a prospective payment system or under any other payment system, by virtue of any past use of the imputed primary care visit requirement of 4,200 visits per year, and Wilson–Coker or her designee shall advise the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services of this Order.

IT IS SO ORDERED.