311 F.3d 132
 COMMUNITY HEALTH CENTER, Plaintiff-Appellee,
v.
Patricia WILSON-COKER, Commissioner of the State of Connecticut Department of Social Services, Defendant-Appellant,
Department of Social Services, Connecticut, Defendant.
 No. 02-7061.
 United States Court of Appeals, Second Circuit.
 Submitted: October 1, 2002.
 Decided: November 8, 2002.
 
 James L. Feldesman, Feldesman, Tucker, Leifer, Fidell & Bank, LLP, Washington, D.C. (Richard R. Brown, Brown, Paindiris & Scott, Hartford, Connecticut, on the brief), for Plaintiff-Appellee Community Health Center.
 Mark S. Davies, Appellate Staff, Civil Division, U.S. Department of Justice, Washington, D.C. (Robert D. McCallum, Jr., Assistant Attorney General, Scott R. McIntosh, Appellate Staff, Civil Division, U.S. Department of Justice, on the brief) for Amicus Curiae the United States.
 Before: MINER, SOTOMAYOR, and KATZMANN, Circuit Judges.
 KATZMANN, Circuit Judge.
 
 
 1
 Plaintiff-Appellant Community Health Center, Inc. ("CHC") provides medical services to the needy pursuant to the federal Medicaid statute, 42 U.S.C. §§ 1396-1396v (2000). CHC is reimbursed for its efforts according to a formula established by the State of Connecticut and superintended by the federal Centers for Medicare and Medicaid Services ("CMS"). Connecticut's formula demands that, in the absence of a waiver, each facility of CHC's variety must conduct at least 4,200 patient "visits" per physician per year, and reduces payments to any facility that fails to meet this threshold. CHC had fewer than 4,200 visits per physician in both 1999 and 2000. It therefore brought suit in the United States District Court for the District of Connecticut, seeking an injunction barring Connecticut's use of the 4,200 standard as incompatible with governing federal law. The District Court (Janet Bond Arterton, J.) concluded that, in order to be consistent with the applicable Medicaid statute, 42 U.S.C. § 1396a(bb)(2) (2000),[1] any state Medicaid payment formula must mirror an existing federal payment formula under the Medicare program, see 42 U.S.C. §§ 1395-1395ggg (2000). Since it also concluded that the Medicare regulation providing for the 4,200 visit minimum was invalid, the District Court granted summary judgment in favor of CHC. For the reasons stated below, we reverse the judgment of the District Court, and remand for further proceedings.
 
 BACKGROUND
 A. The Medicaid Statute
 
 2
 The United States subsidizes health care for persons (other than its own employees) principally through a pair of vast programs, Medicare and Medicaid. Medicare is generally designed to provide health insurance coverage to the elderly and disabled, see 42 U.S.C. § 1395c (2000), and is administered, for the most part, by intermediaries, who must apply a uniform set of standards established by federal law, see 42 U.S.C. § 1395h (2000). Medicaid, on the other hand, is designed to partially compensate States for the costs of providing health care to needy persons of modest income. See Wis. Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473, 479, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002); Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). Although constrained by federal requirements and ongoing CMS oversight, States generally have some measure of discretion in choosing how to expend Medicaid funds. See Schweiker v. Gray Panthers, 453 U.S. 34, 36-37, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981). Indeed, States have the option of opting out of the Medicaid program entirely. See Schweiker v. Hogan, 457 U.S. 569, 581-82 n. 18, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982).
 
 
 3
 States electing to participate in Medicaid must submit a plan detailing how the State will expend its funds. See 42 U.S.C. §§ 1396, 1396a (2000). The Secretary of the U.S. Department of Health and Human Services ("HHS") reviews each plan to assure that it complies with a long list of federal statutory and regulatory requirements. See id.; 42 C.F.R. § 430.15(a) (2002). The Secretary has delegated his power to review and approve plans to CMS Regional Administrators. Id. § 430.15(b). Each state plan must include, among its numerous details, a provision for payments to "Federally-qualified health centers," or "FQHCs." 42 U.S.C. § 1396a(bb) (2000).[2] More specifically, the State plan must provide that it will pay for covered services provided at an FQHC:
 
 
 4
 in an amount (calculated on a per visit basis) that is equal to 100 percent of the average of the costs of the center or clinic of furnishing such services during fiscal years 1999 and 2000 which are reasonable and related to the cost of furnishing such services, or based on such other tests of reasonableness as the Secretary prescribes in regulations under [42 U.S.C. § 1395l(a)(3)].
 
 
 5
 42 U.S.C. § 1396a(bb)(2).
 
 B. Connecticut's State Plan
 
 6
 In 1996, Connecticut enacted legislation providing that, "in the determination of rates for federally qualified health centers, the Commissioner of Social Services [of Connecticut] shall apply Medicare productivity standards." Conn. Gen.Stat. § 17b-245a (2002). A productivity standard, sometimes also known as a "productivity screen," imposes a minimum-visit requirement on affected providers. That is, if a health care provider does not meet or exceed the minimum number of patient visits per year, its reimbursement is reduced in proportion to the amount by which the provider fell short of the minimum.[3] In short, Connecticut reduces Medicaid payments to "unproductive" FQHCs to the same extent that CMS would reduce its Medicare payments to those providers.
 
 
 7
 Medicare productivity screens are authorized by, but not defined in, formally promulgated HHS regulations. The Medicare statute provides for payment of the "reasonable cost" of services rendered, 42 U.S.C. § 1395f(b)(1) (2000), and directs the Secretary to define "reasonable" in regulations, see 42 U.S.C. § 1395x(v)(1)(A) (2000). The Secretary's regulations, in turn, delegate to CMS the power to establish tests of reasonableness, "includ[ing]... screening guidelines." 42 C.F.R. §§ 405.2468(c) (2002). When the Health Care Financing Administration ("HCFA," the predecessor to CMS) and HHS issued § 405.2468 in 1992, a preamble to the rule noted that HCFA planned to use a productivity screen of 4,200 patient-visits per full-time physician. See Medicare Program; Payment for Federally Qualified Health Center Services, 57 Fed.Reg. 24,961, 24,967 (June 12, 1992).
 
 
 8
 Although the 4,200 number does not appear in the CFR, CMS uses that figure as a productivity screen for FQHCs. See Centers for Medicare & Medicaid Services, Rural Health Clinic and Federally Qualified Health Center Manual § 503. Consistent with the regulation, CMS permits waiver of the productivity screen requirements where a provider "has demonstrated reasonable justification for not meeting the standard." Id.; see 42 C.F.R. § 405.2468(d)(1).
 
 
 9
 Connecticut law, therefore, incorporated both the 4,200 productivity screen and the relevant waiver provision beginning in 1996 when the State enacted § 17b-245a.[4] Connecticut's Department of Social Services ("CDSS") has applied the 4,200 productivity screen since that time, although the record does not clearly indicate whether CDSS also made waivers available. Connecticut did not amend its state regulations to reflect these changes until 2001. See Conn. Agencies Regs. §§ 17b-262-661(11), -663 (2001). CMS approved the corresponding Connecticut State Plan amendments on June 21, 2001.[5]
 
 C. Parties and Procedural History
 
 10
 The plaintiff, CHC, is an FQHC operating in the State of Connecticut. In both 1999 and 2000, CHC just missed meeting Connecticut's productivity screen, recording 3,982 visits per physician in 1999 and 4,172 visits per physician in 2000.[6] Because the present Medicaid statute makes future rates dependent upon a provider's "reasonable and related" costs for 1999 and 2000, 42 U.S.C. § 1396a(bb)(2), CHC's shortfalls in that period will result in a reduction in the amount of money it receives in the future for each visit, from $97.34 to $95.19. CHC alleges that this reduction will cost it approximately $90,000 per year.
 
 
 11
 On January 26, 2001, CHC filed suit, in the United States District Court for the District of Connecticut, pursuant to 42 U.S.C. § 1983, challenging CDSS's 4,200 productivity screen as inconsistent with federal law. CHC amended its Complaint on May 15, 2001. The Amended Complaint names as the sole Defendant Patricia Wilson-Coker, the CDSS Commissioner, who is sued only in her official capacity.
 
 
 12
 CHC and Wilson-Coker subsequently each moved for summary judgment. In a thoughtful opinion, the District Court granted summary judgment in favor of CHC on November 30, 2001. See Cmty. Health Ctr., Inc. v. Wilson-Coker, 175 F.Supp.2d 332, 333 (D.Conn.2001). The District Court first determined that the Medicaid statutory phrase, "reasonable and related to the cost of furnishing such services, or based on such other tests of reasonableness as the Secretary prescribes in regulations under [Medicare]," can only be read to mean that any state method for determining costs that are "reasonable and related" must mirror existing federal Medicare regulations. Id. at 336-39 (quoting 42 U.S.C. § 1396a(bb)(2)). The Court next concluded that its search for underlying federal regulations must be limited to "validly-promulgated" regulations. Id. at 342. It therefore went on to consider whether the 4,200 productivity screen contained in CMS's Rural Health Clinic and Federally Qualified Health Center Manual was validly promulgated. Id. at 342-48. The District Court concluded, ultimately, that the federal 4,200 productivity screen was invalid, and therefore that Connecticut's identical screen was contrary to federal law. Id. at 348.
 
 
 13
 This appeal followed. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4). We have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 DISCUSSION
 I.
 
 14
 This case begins and, for our purposes, ends, with the meaning of the federal Medicaid statute. Again, the District Court held that any reasonable understanding of the phrase, "100 percent of the... costs... which are reasonable and related to the cost of furnishing [Medicaid] services, or based on such other tests of reasonableness as the Secretary prescribes in regulations under [Medicare]," 42 U.S.C. § 1396a(bb)(2), limits the meaning of "reasonable and related" to whatever definition the Secretary has validly prescribed under Medicare. Although the statute may not be a masterpiece of draftsmanship, we think that when read in context, and with due regard for the expert opinion of the administering agency, it may offer rather more flexibility than the District Court found.[7]
 
 
 15
 To begin with, it is clear from the face of the statute that "reasonable and related" encompasses more than simply the Secretary's Medicare regulations. The phrase, "or based on such other tests," signals a plain intention to differentiate between two alternatives. Any other reading would render § 1396a(bb)(2) largely redundant; there would be no need to say "based on such other tests of reasonableness as the Secretary prescribes in regulations under [Medicare]" if "reasonable and related" already held the very same meaning.
 
 
 16
 Ambiguity enters, however, when we attempt to determine where we should turn for alternative definitions of "reasonable and related." As the District Court observed, "reasonable and related" is a term of art, see Cmty. Health Ctr., 175 F.Supp.2d at 338, and should be understood to carry with it previous authoritative interpretations. See INS v. St. Cyr, 533 U.S. 289, 312 n. 35, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (citing Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952)). The Medicare statute authorizes the Secretary to define "reasonable" as he chooses. See 42 U.S.C. § 1395x(v)(1)(A) (2000). It does not follow, however, that the Secretary's definition of "reasonable" or "reasonable and related" under Medicare necessarily also defines those terms for Medicaid purposes. Cf. Paragon Health Network, Inc. v. Thompson, 251 F.3d 1141, 1147 (7th Cir.2001) (observing that identical words within same statute need not have the same meaning "when the identical word is used in different provisions which address disparate subjects") (citing United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 213, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001); Atl. Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed.1204 (1932)). Once again, that would simply make the statute redundant. Indeed, the District Court appears to have held (and we agree) that the more plausible reading is that Congress intended "reasonable and related" to permit the Secretary to issue separate regulations defining those terms for Medicaid purposes. See Cmty. Health Ctr., 175 F.Supp.2d at 339 & n. 13.
 
 
 17
 Even so, it is still unclear what Congress intended in the event the Secretary never issued any Medicaid-specific regulations. We agree with the District Court that one possible result is that the phrase, "or based on such other tests of reasonableness as the Secretary prescribes ... under Medicare" functions as a default rule in the event there are no authoritative Medicaid regulations. The outcome of this case would then turn upon whether there are presently any Medicaid-specific "regulations," a question the District Court answered in the negative. See Cmty. Health Ctr., 175 F.Supp.2d at 339 n. 13. CMS, on the other hand, urges us to conclude that in the absence of contrary regulations, "States have broad authority to define reasonable costs for purposes of their Medicaid payment to FQHCs." (Amicus Br. at 12.)[8]
 
 
 18
 In resolving this ambiguity, we owe some significant measure of deference to CMS's interpretation of the statute, although we need not decide the exact molecular weight of the deference we accord to CMS's position. In cases such as this, where a highly expert agency administers a large and complex regulatory scheme in cooperation with many other institutional actors, the various possible standards for deference begin to converge. First, of course, we must defer to agency interpretations appearing in valid regulations issued through notice and comment or adjudication, see Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), or in another format authorized by Congress for use in issuing "legislative" rules, see United States v. Mead Corp., 533 U.S. 218, 231-32, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Less formal interpretations may also be entitled to mandatory deference, depending upon to what extent the underlying statute suffers from exposed gaps in its policies, especially if the statute itself is very complex, as well as on the agency's expertise in making such policy decisions, the importance of the agency's decisions to the administration of the statute, and the degree of consideration the agency has given the relevant issues over time. See Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002). We describe such deference as "mandatory" because in those circumstances we can properly infer that Congress intended the agency to "`enjoy primary interpretational authority,'" and it is our duty to carry out Congress' will. Mead Corp., 533 U.S. at 230 n. 11, 121 S.Ct. 2164 (quoting Thomas W. Merrill & Kristin E. Hickman, Chevron's Domain, 89 Geo. L.J. 833, 872 (2001)). Even if we are not required to defer to a permissible agency interpretation, we still may defer, based largely on a similar set of concerns: the agency's expertise, the care it took in reaching its conclusions, the formality with which it promulgates its interpretations, the consistency of its views over time, and the ultimate persuasiveness of its arguments. See id. at 228, 234-35, 121 S.Ct. 2164.
 
 
 19
 We therefore accord CMS's interpretation considerable deference, whether under Chevron or otherwise. As the Supreme Court recently noted, even relatively informal HCFA (now CMS) interpretations, such as letters from regional administrators, "warrant[] respectful consideration" due to the complexity of the statute and the considerable expertise of the administering agency. Wis. Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473, 479, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002) (citing Mead Corp., 533 U.S.218, 121 S.Ct. 2164, 150 L.Ed.2d 292; Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); Schweiker v. Gray Panthers, 453 U.S. 34, 43-44, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981)). We observe that, as provided in regulations, "CMS regional staff reviews State plans and plan amendments, discusses any issues with the Medicaid agency, and consults with central office staff on questions regarding application of Federal policy." 42 C.F.R. § 430.14 (2002). We take care not lightly to disrupt the informed judgments of those who must labor daily in the minefield of often arcane policy, especially given the substantive complexities of the Medicaid statute.
 
 
 20
 CMS's interpretation is a reasonable reading of an unclear statute. In support of its alternative reading, CMS might invoke the background principles underlying the overall design of the Medicaid program. Cf. Dole v. United Steelworkers of Am., 494 U.S. 26, 35, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990) (stating that interpreting court should look to whole statute, including its object and policy, in construing language of a particular provision). Medicaid, as we have said, is designed as a cooperative venture between States and the federal government. Absent some indications to the contrary, therefore, we presume that a given Medicaid provision is designed to encourage State flexibility. See Blumer, 534 U.S. at 495-96, 122 S.Ct. 962; Skandalis v. Rowe, 14 F.3d 173, 181 (2d Cir.1994); cf. United States v. Bass, 404 U.S. 336, 349-50, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) (holding that where Congress intends to shift distribution of powers between states and the federal government, it must do so clearly). A reasonable reader, applying this interpretive guide to § 1396a(bb), might well conclude that in the absence of any federal definition of "reasonable and related," the States have some freedom to adopt their own approaches.
 
 
 21
 The plaintiff contends, however, that such an approach may permit States to undermine other important federal interests, such as the FQHC direct-grant program. That concern is misplaced. State determinations of "reasonable and related" costs must still be approved by CMS. See 42 U.S.C. §§ 1396, 1396a(b); 42 C.F.R. § 430.15(b). We presume that CMS will continue to safeguard the interests of the United States, even as it cultivates state-level innovation. Thus, CMS's reading of § 1396a(bb)(2) is not inconsistent with the purposes of the Medicaid statute. See Blumer, 534 U.S. at 495, 122 S.Ct. 962 ("[W]e have not been reluctant to leave a range of permissible choices to the States, at least where the superintending federal agency has concluded that such latitude is consistent with the statute's aims.")
 
 
 22
 Although not in itself a determinative factor, the apparent consistency of HHS's approach also adds weight to its position. HHS and its officers have continually taken the position that section 1396a(bb)(2) "does not specifically require exclusive application of the Medicare regulations." (Letter from Margaret A. Leoni, Chief, Medicaid Program Branch, HHS, to Patricia Wilson-Coker, Commissioner, CDSS of 6/21/01, at 1; see Letter from Sally K. Richardson, Director, Medicaid Bureau, HHS, to State Medicaid Directors of 5/8/95, at 1-2; Amicus Br. at 11-14.)
 
 
 23
 We therefore conclude that § 1396a(bb)(1) is ambiguous, and that the Secretary's permissible reading of the statute is entitled to our deference. Because the District Court's interpretation is inconsistent with that of the Secretary, we must reverse the decision of the District Court.
 
 II.
 
 24
 At oral argument, the plaintiff contended that, should we conclude that States have some flexibility to deviate from the Medicare regulations, we should affirm on an alternative ground. Specifically, the plaintiff claimed that even taken on its own terms, the 4,200 productivity screen does not provide for payment of 100% of "reasonable and related costs," as required by the statute.
 
 
 25
 The District Court, however, never reached this issue, and on appeal the parties have not addressed it directly. Where "a theory has been briefed and argued only cursorily in this Court," it is our preferred practice "to remand the issue for consideration by the district court in the first instance." United Food & Commercial Workers Union, Local 919 v. CenterMark Props. Meriden Square, Inc., 30 F.3d 298, 306-07 (2d Cir.1994) (internal quotations omitted); see also United States v. Travers, 514 F.2d 1171, 1173 (2d Cir.1974). Therefore, we will remand to the District Court so that it may consider whether Connecticut's 4,200 productivity screen passes statutory muster on its own terms.
 
 
 26
 That determination, however, should not be confused with another, superficially similar, issue previously considered by the District Court. The District Court has already concluded that the Medicare 4,200 productivity screen is arbitrary and capricious, largely because of irregularities in the administrative record underlying HCFA's decision to implement the screen. See Cmty. Health Ctr., 175 F.Supp.2d at 342-48. We take no position on that question here. We wish to emphasize, however, that whether or not a state provision provides for all "reasonable and related" costs under the Medicaid statute may well be an entirely different question from whether an identical federal provision is invalid for failure to comply with the technical requirements of the Administrative Procedure Act.
 
 
 27
 Therefore, on remand, the district court must consider anew what role CMS's approval of the Connecticut State Plan should play in assessing the reasonableness of the 4,200 productivity screen.[9] That the district court did not grant CMS's approval any deference, Cmty. Health Ctr., 175 F.Supp.2d at 348, is not relevant to the district court proceedings on remand, because that decision was premised on an interpretation of § 1396a(bb) that we have now reversed. The district court therefore should consider whether to defer to the implicit judgment of the Secretary that a state plan complies with federal law. See Concourse Rehab. & Nursing Ctr. Inc. v. Whalen, 249 F.3d 136, 145 (2d Cir.2001) (citing Perry v. Dowling, 95 F.3d 231, 236-37 (2d Cir.1996); Pinnacle Nursing Home v. Axelrod, 928 F.2d 1306, 1313 (2d Cir.1991)). In making this determination, the district court should bear in mind the principles of deference that we have outlined above. Deference, however, even at its highest levels, is not a "rubber stamp[]." Pinnacle Nursing Home, 928 F.2d at 1314. In assessing the reasonableness of CMS's decision, the district court may consider the materials submitted by Connecticut in support of its plan, and the factors considered by CMS in evaluating those materials.
 
 
 28
 The judgment of the District Court is Reversed and Remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The District Court cited the provision in question as 42 U.S.C. § 1396a(aa). Congress has since redesignated it as 42 U.S.C. § 1396a(bb)See Native American Breast and Cervical Cancer Treatment Technical Amendment Act of 2001, Pub.L. No. 107-121, § 2(b)(1), 115 Stat. 2384, 2384 (2002). We employ the current designation in this opinion.
 
 
 [2]
 An FQHC is an entity receiving direct grants from the United States to provide primary and other health care services to "medically underserved" communities. 42 U.S.C. §§ 254b, 1396d(l)(2)(B) (2000). In addition to receiving direct grants, an FQHC can also bill for providing Medicare or Medicaid services. See 42 U.S.C. §§ 1395k(a)(2)(D)(ii), 1396a(bb)(2) (2000). This dual funding mechanism allows the FQHC to allocate most of its direct grant dollars towards treating those who lack even Medicare or Medicaid coverage. See H.R.Rep. No. 101-247, at 392-93 (1989), reprinted in 1989 U.S.C.C.A.N. 1906, 2118-19.
 
 
 [3]
 For example, if a provider had only 900 visits in a year, and the state's productivity screen number is 1,000, the provider would be paidonly 90% of what it would have otherwise received
 
 
 [4]
 The parties do not dispute that by "Medicare productivity standards," the Connecticut legislature intended to include standards appearing in CMS's manuals
 
 
 [5]
 The record does not indicate whether CMS (then HCFA) was aware of the effect of Conn. Gen.Stat. § 17b-245a prior to 2001. We note that although certain portions of the Amended Complaint appear to challenge CMS's decision to approve the Plan,cf. Erie County Geriatric Ctr. v. Sullivan, 952 F.2d 71 (3d Cir.1991) (upholding challenge to HHS's approval of Pennsylvania State Plan), CHC did not name CMS as a defendant, and CMS is not a party to this litigation.
 
 
 [6]
 It is unclear whether CDSS actually reduced CHC's payments for 1999 and 2000. CHC's Amended Complaint does not appear to seek retrospective relief. Nor does CHC argue that CDSS's actions prior to June of 2001 were invalid because CDSS had not formally amended its Plan to reflect Conn. Gen.Stat. § 17b-245aSee Concourse Rehab. & Nursing Ctr., Inc. v. DeBuono, 179 F.3d 38, 44-45 (2d Cir.1999). Accordingly, we need not consider those issues.
 
 
 [7]
 We review the District Court's decision to grant summary judgmentde novo. See Rogers v. City of Amsterdam, 303 F.3d 155, 158 (2d Cir.2002).
 
 
 [8]
 We observe in this regard that the District Court did not have the benefit of the amicus brief filed by the United States in this Court, which clarified significantly CMS's position. Although our conclusion ultimately turns on an interpretation of the Medicaid statute itself, we note that any interpretation of the Medicaid regulations in an amicus brief from the Secretary is entitled to some deference from this courtSee Auer v. Robbins, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (deferring to interpretation of regulations promulgated under the Fair Labor Standards Act contained in an amicus brief from the Secretary of the Department of Labor); see also I Richard J. Pierce, Jr., Administrative Law Treatise § 6.11, at 395-403 (4th ed.2002); Jon Connolly, Note, Alaska Hunters and the D.C. Circuit: A Defense of Flexible Interpretive Rulemaking, 101 Colum. L.Rev. 155, 174-77 (2001) (analyzing judicial deference to agency interpretations of their own regulations).
 
 
 [9]
 Our rather casual review of other state plans reveals that CMS has approved at least one other state plan incorporating Medicare FQHC reimbursement principlesSee State of New Jersey, State Plan Under Title XIX of the Social Security Act, Attachment 4.19B p. 9(c) (Jan. 1, 1998), at http://www.cms.gov/ medicaid/stateplans/State_Data/NJ/4.19/Attachments/B/A_002.pdf ("Medicare principles of reimbursement of FQHCs are used to determine reasonable costs.").