*85 TEXTO COMPLETO DE LA SENTENCIA
Los aquí recurrentes presentaron un escrito en el cual nos solicitan que revoquemos una Sentencia Parcial dictada por el Tribunal de Primera Instancia, Sala de San Juan, el 16 de junio de 2004.
Examinado el escrito, se expide el auto solicitado y, por entender que no se cometieron los errores señalados, se confirma la determinación recurrida.
I
El 10 de mayo de 2002, la Asociación de Salud Primaria de Puerto Rico, Inc. y diecinueve corporaciones sin fines de lucro, presentaron una petición de mandamus y sentencia declaratoria ante el Tribunal de Primera Instancia, Sala de San Juan (en adelante T.P.I.). Dichas entidades son centros de salud certificados por el Gobierno de Estados Unidos (Federally Qualified Health Centers-FQHC, en adelante los Centros) que proveen servicios de salud a los beneficiarios del programa Medicaid en Puerto Rico y a los beneficiarios del plan de salud del Estado Libre Asociado de Puerto Rico (en adelante E.L.A).
En la petición, los Centros solicitaron al T.P.I. la expedición de un auto de mandamus para que se ordenara al Secretario de Salud y al Director de la Oficina de Asistencia Médica de Puerto Rico enmendar la Sección 4.19 (b) del plan estatal de Medicaid para implantar un programa de reembolso a los Centros que habían sido subcontratados por las casas aseguradoras bajo el plan de salud del E.L.A. Dicha solicitud se hizo a base de una enmienda a la ley federal que obliga a los estados participantes del programa Medicaid a pagar a los Centros el 100% de los costos razonablemente incurridos en la prestación de servicios a pacientes Medicaid. Solicitaron, además, que una vez implantado el programa de reembolso, se declarara si el mismo debía ser retroactivo al 1 de octubre de 1997.
Luego de varios incidentes procesales, varios Centros solicitaron al T.P.I. que dictara un remedio provisional. En resumen, dicho remedio consistiría en que el E.L.A. pagaría, provisionalmente, la cantidad de $15 mensuales por paciente Medicaid a cada uno de los Centros demandantes.
*86 El 25 de agosto de 2003 se celebró una vista argumentativa en la cual se discutió la procedencia del remedio provisional antes mencionado. En dicha vista surgió una controversia respecto a si procedía descontar del costo total por paciente Medicaid las aportaciones que los Centros recibían directamente del gobierno federal (‘ fondos 330”). Sobre esa controversia trata el caso ante nuestra consideración. En vista de la controversia antes indicada, el T.P.I. ordenó a las partes presentar Memorandos de Derecho sustentando sus posiciones al respecto.
El E.L.A. y la Administración de Seguros de Salud (en adelante A.S.E.S.), quienes figuraban entre los demandados en el caso en cuestión, sostuvieron que los "fondos 330" recibidos por los Centros y dirigidos a ofrecer o mejorar los servicios médicos brindados por éstos, debían ser deducidos del costo total por paciente Medicaid, pues de lo contrario se le estaría pagando a los Centros por un servicio cuyo costo ya había sido cubierto por las referidas aportaciones federales. Los Centros no estuvieron de acuerdo con dicha interpretación. Entre otras cosas, señalaron que los "fondos 330" no podían ser utilizados para sufragar los costos de servicios a pacientes Medicaid, pues estos fondos tenían el fin de permitir a los Centros brindar servicios de salud a los pacientes que no cualificaban bajo dicho programa. Indicaron que si los Centros no recibieran del E.L.A. el pago del 100% de los costos 'razonables por prestación de servicios a pacientes Medicaid, éstos se verían obligados a utilizar los "fondos 330" para prestar servicios a esos pacientes, privando de servicios a la población que no cualifica para el programa y para la cual dichos subsidios iban realmente dirigidos.
Así las cosas, el T.P.I. dictó una Sentencia Parcial en la. cual resolvió que no procedía el descuento solicitado por el E.L.A., pues los "fondos 330" tenían que ser utilizados para los propósitos específicos establecidos por las propias aportaciones. Utilizó el ejemplo de los "93-914 HTV Emergency Relief Projects Grants", los cuales tienen que ser utilizados por los centros de salud para desarrollar y operar programas que atiendan de forma efectiva a los ciudadanos afectados por el VIH. Expresó el T.P.I. que el permitirle al E.L.A. descontar dichos fondos del costo total por paciente Medicaid, equivaldría a obligar a los Centros a utilizar aportaciones federales para sufragar servicios para los cuales no fueron concedidos.
Inconformes con tal determinación, el E.L.A. y A.S.E.S presentaron una solicitud de reconsideración a la cual los Centros oportunamente se opusieron. El 16 de junio de 2004, el T.P.I. dictó una "Sentencia Parcial en Reconsideración". Expresó el T.P.I. que era incorrecto el argumento de los Centros en cuanto a que los "fondos 330" sólo podían ser utilizados en beneficio de personas sin seguro de salud. Resolvió ese tribunal que cuando los "fondos 330" fuesen aprobados para apoyar o fomentar la realización de estudios para desarrollar nuevos métodos o mejorar los métodos existentes para proveer mejores servicios de salud, éstos podían ser deducidos de los costos razonables por paciente Medicaid. No así cuando los fondos hubiesen sido expresamente concedidos para ofrecer beneficios a personas sin seguro de salud o para apoyar un período inicial de nuevos programas de salud.
Por estar en desacuerdo con dicha determinación, los hoy recurrentes presentaron el escrito ante nuestra consideración. En el mismo, se le atribuye al T.P.I. la comisión de los siguientes errores:

“1. Erró el T.P.I. al concluir que, a los fines de computar el reembolso que el E.L.A. está obligado apagar bajo lo dispuesto en 42 U.S.C.A. sec. 1396a(bb), el E.L.A. puede descontar de los costos de los servicios a pacientes Medicaid ("allowable costs") aquellos "grants" que deban ser descontados según lo dispuesto en la Sección 612.3 del Manual del Proveedor de Medicare.

2. Erró el T.P.I. al basar sus determinaciones 4, 5, 6 y 7, así identificadas en la Sección III-E de esta petición, en el lenguaje obsoleto de la Sección 612 del Manual del Proveedor de Medicare que fue adoptado específicamente para la implantación de una Sección de la LPSF que fue expresamente derogada por el Congreso en 1975, cuando fue creada la Sección 330 bajo la cual los Centros reciben esos "grants". Desde 1975, la Sección 314 (e) no existe. Los peticionarios reciben "grants" bajo otras Secciones de la LSPF que fueron aprobadas después que esa Sección fue derogada. ”

*87 II
El Programa Medicaid fue diseñado para compensar parcialmente a los gobiernos estatales de las distintas jurisdicciones de Estados Unidos por los costos de proveer servicios de salud a personas de bajos ingresos económicos. Wis. Dep’t of Health & Family Servs. v. Blummer, 534 U.S. 473, 479 (2002). El referido programa fue diseñado como un esfuerzo conjunto entre los estados y el gobierno federal. Community Health Center v. Wilson Coker, 311 F.3d 132 (2002).
A pesar de que los estados acogidos al Programa Medicaid están obligados a cumplir con los requisitos establecidos en las leyes y reglamentación federal aplicables, se les ha reconocido discreción a la hora de determinar cómo van a utilizar las aportaciones federales que reciben como parte del referido programa. Community Health Center v. Wilson Coker, supra; Schweiker v. Gray Panthers, 453 U.S. 34 (1981). De hecho, los estados tienen la opción de no participar en el programa o de, luego de haberse acogido, retirarse del mismo. Community Health Center v. Wilson Coker, supra; Schweiker v. Hogan, 457 U.S. 569 (1982).
Los estados que deciden participar en el Programa Medicaid están obligados a someter un plan en el'cual se informe, entre otras cosas, la manera en que el estado se dispone a utilizar los fondos que le son concedidos. 42 U.S.C.A. sec. 1396a. El Secretario de Salud de Estados Unidos deberá asegurarse de que el plan cumple con una serie de requisitos estatutarios y reglamentarios. 42 U.S.C.A. sec. 1396a; 42 C.F.R. sec. 430.15 (a). El plan debe incluir una cláusula referente al pago que el estado proveerá a los "Federally Qualified Health Centers" en concepto de los servicios prestados a los pacientes Medicaid. A esos efectos, la Sección 1396a(bb) de la Ley de Seguro Social Federal, 42 U.S.C.A. sec. 1396a(bb), dispone lo siguiente:

“(bb) Payment for services provided by Federally-qualified health centers and rural health clinics

(1) In general. Beginning with fiscal year 2001 with respect to services furnished on or after January 1, 2001, and each succeeding year, the State plan shall provide for payment for services described in section 1396d(a)(2)(C) of this title furnished by a Federally-qualified health center and services described in section 1396(a)(2)(B) of this title furnished by a rural health clinic in accordance with the provisions of this subsection.

(2) Fiscal year 2001. Subject to paragraph (4), for services furnished on and after January 1, 2001, during fiscal year 2001, the State plan shall provide for payment for such services in an amount (calculated on a per visit basis) that is equal to 100 percent of the average of the costs of the center or clinic of furnishing such services during fiscal years 1999 and 2000 which are reasonable and related to the cost of furnishing such services, or based on such other tests of reasonableness as the Secretary prescribes in regulations under section 13951(a)(3) of this title, or, in the case of services to which such regulations do not apply, the same methodology used under 13951(a)(3) of this title, adjusted to take into account any increase or decrease in the scope of such services furnished by the center or clinic during fiscal year 2001. ”

Los Federally Qualified Health Centers (para propósitos de esta Sentencia, los Centros) también reciben aportaciones federales para proveer servicios de salud a comunidades designadas como médicamente subservidas ("medically underserved"). Dichas aportaciones las reciben directamente del gobierno federal y surgen de la Sección 330 de Ley de Salud Pública Federal (en adelante LSPF), 42 U.S.C.A. sec. 254b.
Conforme a la Sección 330 y para tener acceso a los "fondos 330" que dicha Sección provee, los Centros presentan propuestas que deben ser aprobadas por el Secretario de Salud de Estados Unidos. 42 U.S.C.A. see, 254b. La referida Sección divide los "fondos 330" en varias categorías principales:

“(c) Planning grants:

(1) In general. (A) Centers. The Secretary may make grants to public and nonprofit private entities for 
*88
projects to plan and develop health centers which will serve medically underserved populations. A project for which a grant may be made under this subsection may include the cost of the acquisition and lease of buildings and equipment (including the costs of amortizing the principal of and paying the interest on, loans) and shall include...(B) Comprehensive service delivery networks and plans. The Secretary may make grants to health centers that receive assistance under this section to enable the centers to plan and develop a network or plan for the provision of health services, which may include the provision of health services on a prepaid basis or through another managed care arrangement, to some or to all of the individuals which the centers serve...

(e) Operating grants:

(1) Authority. (A) In general. The Secretary may make grants for the costs of the operation of public and nonprofit private health centers that provide health services to medically underserved populations... (2) Use of funds. The costs for which a grant may be made under subparagraph (A) or (B) of paragraph (1) may include the costs of acquiring and leasing buildings and equipment (including the costs of amortizing the principal of, and paying interest on, loans), and the costs of providing training related to the provision of required primary health services and additional health services and to the management of health center programs. (3) Construction. The Secretary may award grants which may be used to pay the costs associated with expanding and modernizing existing buildings or constructing new buildings (including the costs of amortizing the principal of, and paying the interest on, loans) for projects approved prior to October 1, 1996...

(f) Infant mortality grants:

(1) In general. The Secretary may make grants to health centers for the purpose of assisting such centers in— (A) providing comprehensive health care and support services for the reduction of— (i) the incidence of infant mortality; and (ii) morbidity among children who are less than 3 years of age; and (B) developing and coordinating service and referral arrangements between health centers and other entities for the health management of pregnant women and children described in subparagraph (A)...

(g) Migratory and seasonal agricultural workers

(1) In general. The Secretary may award grants for the purposes described in subsections (c), (e), and (f) of this section for the planning and delivery of services to a special medically underserved population comprised of— (A) migratory agricultural workers, seasonal agricultural workers, and members of the families of such migratory and seasonal agricultural workers who are within a designated catchments area; and (B) individuals who have previously been migratory agricultural workers but who no longer meet the requirements of subparagraph (A) of paragraph (3) because of age or disability and members of the families of such individuals who are within such catchments area...

(h) Homeless population

(1) In general. The Secretary may award grants for the purposes described in subsections (c), (e), and (f) of this section for the planning and delivery of services to a special medically underserved population comprised of homeless individuals, including grants for innovative programs that provide outreach and comprehensive primary health services to homeless children and children at risk of homelessness. ..(3) Supplement not supplant requirement. A grant awarded under this subsection shall be expended to supplement, and not supplant, the expenditures of the health center and the value of in kind contributions for the delivery of services to the population described in paragraph

(1)...

(i) Residents of public housing

*89
(1) In general. The Secretary may award grants for the purposes described in subsections (c), (e), and (f) of this section for the planning and delivery of services to a special medically underserved population comprised of residents of public housing (such term, for purposes of this subsection, shall have the same meaning given such term in section 1437a (b)(1) of this title) and individuals living in areas immediately accessible to such public housing. (2) Supplement not supplants. A grant awarded under this subsection shall be expended to supplement, and not supplant, the expenditures of the health center and the value of in kind contributions for the delivery of services to the population described in paragraph (1)...”.

Ill
Por entender que se encuentran estrechamente relacionados, consideraremos conjuntamente los méritos de los señalamientos de error contenidos en el recurso presentado.
El caso ante nuestra consideración requiere que determinemos, en primer lugar, si las aportaciones que los Centros reciben directamente del gobierno federal, es decir los "fondos 330", pueden utilizarse para brindar servicios a pacientes Medicaid. En segundo lugar, debemos determinar si a la hora de cumplir con lo dispuesto en la referida Sección 1396a(bb), supra, el E.L.A. puede descontar los "fondos 330" recibidos por los Centros de los costos razonablemente incurridos por éstos respecto a los servicios brindados a los pacientes Medicaid.
Respecto a la primera de estas interrogantes, resulta imperativo comenzar por establecer que en ninguna de las disposiciones federales antes citadas se establece que la frase "medically underserved" excluya a los pacientes Medicaid. De hecho, la propia LSPF no los excluye, al definir la referida frase de la siguiente manera:
“The term "medically underserved population" means the population of an urban or rural area designated by the Secretary as an area with a shortage of personal health services or a population group designated by the Secretary as having a shortage of such services". 42 U.S.C.A. sec. 254b(b)(3)(A).
Por otro lado, la LSPF no contiene disposición que respalde el argumento de los Centros respecto a que los "fondos 330" no pueden utilizarse para sufragar los costos de los servicios de salud brindados a los pacientes Medicaid. Los Centros arguyen lo contrario. A esos efectos, citan la sección 254b (1)(3)(G)(ii)(II) de la LSPF, 42 U.S.C.A 254b (1)(3)(G)(ii)(II). Dicha disposición establece lo siguiente:

“(3) Requirements. Except as provided in subsection (e)(1)(B) of this section, the Secretary may not approve an application for a srant under subvarasrayh (A) or (B) of subsection (e)(1) of this section unless the Secretary determines that the entity for which the application is submitted is a health center (within the meaning of subsection (a) of this section) and that...

(F) the center has made or will make and will continue to make every reasonable effort to collect appropriate reimbursement for its costs in providing health services to persons who are entitled to insurance benefits under title XVIII of the Social Security Act [42 U.S. C. 1395 et seq.], to medical assistance under a State plan approved under title XIX of such Act [42 U.S.C. 1396 et seq.], or to assistance for medical expenses under any other public assistance program or private health insurance program;

(G) the center— (i) has prepared a schedule of fees or payments for the provision of its services consistent with locally prevailing rates or charges and designed to cover its reasonable costs of operation and has prepared a corresponding schedule of discounts to be applied to the payment of such fees or payments, which discounts are adjusted on the basis of the patient’s ability to pay; (ii) has made and will continue to make every reasonable effort— (I) to secure from patients payment for services in accordance with such schedules; and (II) to collect reimbursement for health services to persons described in subparagraph (F) on the basis of the full amount of fees and payments for such services without application of am discount; and (Hi) has submitted to the Secretary such reports as the Secretary may require to determine compliance with this subparagraph;
*90 (...)". (Énfasis suplido).
Nótese que de la letra de esta disposición surge con claridad que la misma sólo aplica a los "operating grants" contemplados en la sub-sección 254b(e)(l) de la LSPF, anteriormente citada. Lo que dicha disposición establece es que un Centro que solicita tener acceso a un "operating grant", tiene que demostrar, entre otras cosas, que ha hecho y que hará todos los esfuerzos posibles para cobrar el reembolso apropiado por los costos de los servicios de salud ofrecidos a pacientes Medicaid y Medicare, "on the basis of the full amount of fees and payments for such services without the application of any discount". El argumento de los Centros respecto a que los "fondos 330" no pueden utilizarse para pagar los costos de los servicios cubiertos por los pacientes Medicaid, sencillamente no descansa en el texto de la ley.
Si los "fondos 330" pueden utilizarse para ofrecer servicios médicos a pacientes Medicaid, sería razonable concluir que el gobierno estatal pueda descontar dichas aportaciones federales del pago que éste viene obligado a efectuar en concepto del reembolso de los "costos razonablemente incurridos” por los Centros en la prestación de servicios médicos a los referidos pacientes. Esto, claro está, siempre y cuando se demuestre que estas aportaciones federales efectivamente han sido o puedan ser utilizadas para brindar servicios a beneficiarios del Programa Medicaid y que se establezca que los subsidios específicos no proscriban tal uso.
Sin embargo, debemos determinar si existe alguna disposición federal que expresamente prohíba a los gobiernos estatales el realizar el referido descuento. Tal y como se desprende de los propios escritos sometidos por las partes, no existe tal disposición.
De otra parte, la jurisprudencia federal le ha reconocido a los gobiernos estatales discreción y flexibilidad a la hora de establecer qué constituye un "costo razonable" incurrido por un Centro en la prestación de servicios a pacientes Medicaid. Community Health Center v. Patricia Wilson-Coker, supra.
IV
En el presente caso, el gobierno estatal pretende descontar del reembolso que está obligado a pagar a los Centros, conforme a la Sección 1396a(bb) de la Ley de Seguro Social Federal, supra, las cantidades que estas entidades hayan recibido directamente del gobierno federal y a la vez puedan utilizar para prestar servicios a los beneficiarios del Programa Medicaid.
La Sección 1396a(bb), supra, obliga a los estados a rembolsar a los Centros el 100% de los costos "razonablemente incurridos" en la prestación de servicios a los pacientes Medicaid. Se le ha reconocido a los estados discreción para determinar lo que constituye un "costo razonablemente incurrido". No resulta irrazonable excluir de dicho concepto costos en los que realmente los Centros no han incurrido, pues han sido sufragados por aportaciones recibidas directamente del gobierno federal.
Ya que no existe disposición federal que prohíba a los Centros utilizar los "fondos 330" para prestar servicios a pacientes Medicaid, entendemos que un estado no está legalmente impedido de descontar del reembolso en cuestión las aportaciones federales que puedan ser utilizadas para brindar servicios a estos pacientes.
Al así resolver, resulta innecesario que nos expresemos respecto a lo establecido en la Sección 612 del Manual del Proveedor de Medicare.
V
Por los fundamentos antes expuestos, se expide el auto solicitado, se confirma la determinación recurrida y se devuelve el expediente al Tribunal de Primera Instancia para la continuación de los procedimientos.
*91 Así lo pronunció y manda el Tribunal y lo certifíca la Secretaria.
Leda. Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones